**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| **KOLBY STEMBRIDGE, ET AL.,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | |
| **vs.** | Case No. 1:11CV49DAK |
| **NATIONAL FEEDS INC., ET AL.,** | Judge Dale A. Kimball |
| **Defendants.** | |

This matter is before the court on Defendant Rangen Inc.'s Motion for Summary Judgment and Motion to Exclude Expert Testimony. Defendant National Feeds Inc. joined in Rangen's motions. After the motions were fully briefed, on September 11, 2013, the court held a hearing on the motions. At the hearing, Plaintiffs were represented by D. Williams Ronnow and Megan E. Garrett, Rangen was represented by Hans A. Mitchell, and National Feeds was represented by Allison S. Fletcher. The court heard oral argument from counsel for Plaintiffs and Rangen and then took the motion under advisement. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties. The court has further considered the law and facts relevant to the motion. Now being fully advised, the court enters the following Memorandum Decision and Order.

## BACKGROUND

The Stembridges are three generations of family mink ranchers in Peoa, Utah. The Stembridges each ran separate herds on the ranch, but used common sheds and equipment to care

for the mink.  The Stembridges are each members of the Fur Breeders Agricultural Cooperative

("Co-op"), which is an organization of fur breeders that provides various services to its members,

including feed, vaccinations, and veterinary services.  Over 100 mink ranches are part of the Co-

op.

The Stembridges feed their mink a base diet that is comprised of wet feed purchased and

received through the Co-op.  The Co-op supplied feed is intended to be a complete feed that will

allow mink to be raised without additional feeds or supplements.

In 2010, however, the Stembridges ordered Reproduction Crumlets and Lactation

Crumlets from National Feeds, Inc.  National Feeds markets its crumlets as supplemental feeds to

be added to a base wet feed diet.  To fulfill the Stembridges' order, National Feeds used Rangen,

a toll miller, to manufacture and then ship the feed.  Rangen and National Feeds have a contract,

whereby Rangen manufactures product for National and distributes that product directly to

National Feeds' customers.

The Stembridges incorporated the Reproduction Crumlet into their minks' diet beginning

in March 2010, and increased the percentage of crumlet until the diet reached twenty percent

crumlets and eighty percent wet feed.  After feeding the Reproduction Crumlet and beginning to

feed the Lactation Crumlet, the Stembridges noticed that many of the mink had no kits and those

that did have kits had small litter sizes.  The Stembridges also began to notice that many of the

breeding females appeared to be blind and the kits were sluggish, partially paralyzed, had crusty

eyes and noses, were greasy and skinny, did not "fur out," and were otherwise unhealthy.  After

the kits were weaned and vaccinated, they began dying.  For three to four weeks, the Stembridges

lost large numbers of mink daily, totaling approximately 45% of their expected kit crop.

The Stembridges took several of their mink for examination at diagnostic laboratories,

including the Utah Veterinary Diagnostic Laboratory ("UVDL"). They learned that the mink presented physical changes showing that they suffered from vitamin E deficiency. Because the Stembridges suspected that the problem was caused by the feed, the Stembridges tested their remaining Reproduction Crumlet. One test showed that the vitamin E in the crumlet was less than guaranteed on the label, while another showed that the fat levels did not meet the label guarantee. The Stembridges later had the Lactation Crumlet tested and the test showed that it contained ionophore monensin. The parties dispute whether minks can tolerate monensin.

The Stembridges expert, Dr. Hildebrandt, concluded that the Reproduction Crumlet reduced the overall level of fat in the minks' diet, prevented the mink from accumulating sufficient bodily stores of vitamin E, and predisposed the mink to suffer a vitamin E deficiency in the event their immune systems were challenged. Dr. Hildebrandt further opined that the Lactation Crumlet with monensin caused oxidative stress reaction in the mink and accelerated the minks' depletion of already low levels of vitamin E. The reduced levels of vitamin E allegedly caused the mink to suffer immunosuppression and vitamin E deficiency, which eventually resulted in the minks' death through secondary infections and kidney damage.

The parties dispute whether Rangen followed National Feeds' formula and directions for the crumlets. The Stembridges allege that the Lactation Crumlets contained monensin, which is not one of the ingredients identified on the label, and the Reproduction Crumlets failed to meet National Feeds' requirements for vitamin E and fat.

The parties also dispute whether Rangen sells mink feed. Rangen contends that, as a miller, it does not sell mink feed. The Stembridges, however, allege that under the contract between Rangen and National, Rangen sells mink feed to National. Rangen further alleges that it did not sell the mink feed at issue in this case. The Stembridges ordered the feed from National,

and Rangen manufactured and delivered the feed to the Stembridges according to Rangen's contract with National. The Stembridges, therefore, assert that the payment Rangen received from National for the Stembridges' order was based on Rangen's sale of the product to National under the contract.

Furthermore, the parties dispute whether Rangen's packing slips accompanying the crumlets that were shipped to the Stembridges provide any warranty to the Stembridges. The packing slips stated: "We warrant that seeds, feeds and plants we sell will conform to the label description as required under state and federal laws." Rangen contends that the warranty does not apply to the Stembridges because Rangen did not sell the crumlets in this case. Rangen claims that National sold the crumlets to the Stembridges and Rangen only manufactured the crumlet and shipped it to the Stembridges. Therefore, Rangen asserts that it did not sell the crumlet to anyone and the warranty does not apply. However, the Stembridges argue that by manufacturing and shipping the product under the terms of Rangen's contract with National, and receiving payment from National for doing so, Rangen sold the crumlet to National. Therefore, the warranty should apply.

## DISCUSSION

### Rangen's Motion to Exclude Expert Testimony

Rangen moves for an order excluding the testimony of Dr. Hugh Hildebrandt, D.V.M., the Stembridges' veterinarian expert, and Douglas Fizzell, the Stembridges' damages expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Tenth Circuit has recognized the trial court has broad discretion in fulfilling its "gatekeeping role" of reviewing and determining admissibility of proffered expert testimony under Rule 702 and *Daubert*. *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir.

2000).

**A.  Dr. Hildebrandt**

Rangen argues that Dr. Hildebrandt does not have the required expertise in nutrition because it requires expertise in the formulation of diets to meet the nutritional needs of the animals consuming those diets.  In his first report, Dr. Hildebrandt mistakenly calculated the vitamin E levels.  When he submitted a supplemental report, with the calculation corrected, he did not explain why he had done it wrong in the first report.  This error, however, does not demonstrate that Dr. Hildebrandt is unqualified.  Rather, it shows that Dr. Hildebrandt made a mistake that was later corrected.  The court is unaware of any requirement that an expert explain why he made a mistake.  Dr. Hildebrandt has a Doctor of Veterinary Medicine from the University of Wisconsin at Madison and has had a private veterinary practice for 23 years in which he routinely treats mink in ranch settings.  During Dr. Hildebrandt's many years of veterinarian practice he has had extensive experience with the nutritional and dietary needs of the animals he treats.  The court finds no basis for excluding Dr. Hildebrandt's testimony with respect to nutritional issues.  If Rangen believes that specific opinions lack merit, it can address its contentions on cross examination.

Rangen also claims that Dr. Hildebrandt's opinions should be excluded because he ignores contrary evidence. Again, this argument is not a basis for excluding his testimony altogether.  Rangen can question Dr. Hildebrandt as to the contrary evidence on cross examination.

Rangen's further disputes Dr. Hildebrandt's theory as to the causation of harm to the minks as lacking factual and scientific support.  During Dr. Hildebrandt's practice as a veterinarian he has assisted clients with identifying various toxins and herd exposure to toxic

substances and has been involved in clinical studies involving the adverse effects of toxins in different animals. His education, skill, and extensive veterinary clinical experience with mink qualify him as an expert entitled to provide opinion testimony. His opinions are within his realm of expertise and based on scientific principles and facts. Rangen's criticisms of Dr. Hildebrandt's opinions pertain only to discrete portions of his report and do not affect his analysis as a whole. Rangen's contentions go to the weight to be afforded Dr. Hidebrandt's theory, not the admissibility of it. The court, therefore, finds no basis for Rangen's motion.

### B. Fizzell

Rangen also seeks to exclude the damages opinions of Douglas Fizzell. Mr. Fizzell does not dispute that Rangen's damages expert's calculations are inaccurate, rather he disputes that they are the proper measure of Plaintiff's damages. Mr. Fizzell suggests that the calculation does not take into account that the Stembridges retain kits to grow the size of their herd, may pelt out breeders to reduce the size of their herd, or sell live animals as breeders to other ranchers. However, Rangen claims that this information does not apply to Plaintiffs, or is taken into account by Rangen's expert. Therefore, Rangen argues that Mr. Fizzell's method is not valid and his testimony should be excluded.

The court agrees with the Stembridges that Rangen's challenge to Mr. Fizzell's opinion essentially requests the court to adopt Rangen's theory of the case and then exclude Fizzell's opinion because it contradicts Rangen's position. The dispute as to reproduction rates is a question for the jury. Fizzell's opinion is supported by evidence and is properly admissible. Accordingly, Rangen's Motion to Exclude Expert Testimony is denied.

### Rangen's Motion For Summary Judgment

As an initial matter, the parties both raise the issue of whether Utah or Idaho law should

apply because the Stembridges are located in Utah but Rangen is located in Idaho. Utah and Idaho law does not significantly differ with respect to all of the claims except the negligent misrepresentation claim. However, to the extent that there is a conflict between Utah and Idaho law, under the "most significant relationship" approach, the court concludes that Utah has the most significant relationship to the dispute and Utah law governs.

## I. Breach of Warranty Claims

Rangen argues that no express or implied warranties arose in this case because it did not sell a product to anyone. Rangen contends that it provided a tolling service but did not sell a product. Under Rangen and National Feeds' Fur Feed Production Agreement, National compensated Rangen per ton for toll manufacturing. Rangen procured its own ingredients and materials for production of the goods and sent National monthly invoices for payment as to finished products shipped, which also included current ingredient costs. National was required to send Rangen a check within 14 days of the invoices that included both manufacturing compensation and ingredient reimbursement. The parties further agreed that delivery charges for goods delivered to customers were to be based on actual delivery charges. Therefore, although Rangen claims that it did not sell the crumlets to National, National paid it for manufacturing, ingredients, and shipping.

The preamble of the Fur Feed Production Agreement further states: "Whereas, Rangen desires to produce certain mink and fox feeds (Goods) **for sale** in the United States;" and "Whereas, National is willing, subject to the terms and conditions hereof, to disclose the formulae for the purpose of **selling** to customers in the United States." Although it is undisputed in this case that Rangen did not sell the crumlets directly to the Stembridges, it is not clear under the Fur Feed Production Agreement that Rangen was not selling the crumlets to National. The

crumlets contained a National Feeds label and it appears that National Feeds entered the contract for sale with customers, but Rangen processed such quantities of feed as customers requested, acquired the ingredients for the feed, produced the feed according to National's formula, agreed to maintain the standard and quality of goods required by National, and shipped the feed to specific customers.

## A. Express Warranties

Under Utah law "a consumer can recover for breach of an express warranty despite a lack of privity." *State of Utah v. GAF Corporation*, 760 P.2d 310, 315 (Utah 1988). In *GAF*, the court recognized that manufacturers can be held responsible for a variety of express warranties. *Id.* "'It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess, and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the customer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable.'" *Id.* (quoting *Baxter v. Ford Motor Co.*, 12 P.2d 409, 412 (Wash. 1932)).

The Stembridges argue that Rangen expressly warranted that the crumlets would conform to its label description as required under state and federal law. The Stembridges, directly and as a third-party beneficiary, benefit from Rangen's express warranty that the crumlets would conform to the label descriptions. Affirmations of fact or promise, description of the goods, and samples or models that are made part of the basis of the bargain can create express warranties. Utah Code Ann. § 70A-2-313(1)(a)-(c). Rangen's documents acknowledge that the feed it produces is sold. Under Utah law, the Stembridges are allowed to recover upon the warranty both as expressed users of the crumlet Rangen manufactured for National and as third-party

beneficiaries to the contract between National and Rangen.

The Utah Uniform Commercial Code imputes privity to the Stembridges under these circumstances. The scope of Rangen's express warranty is not limited solely to the immediate buyer and seller; rather, it "extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." Utah Code Ann. § 70A-2-318. "Any beneficiary of a warranty may bring a direct action for breach of warranty against the seller whose warranty extends to him." U.C.C. § 2-318. The Stembridges, as the ultimate purchasers and users of the crumlet, benefit from these warranties.

In this case, the Stembridges are expressly contemplated third-party beneficiaries to Rangen and National Feeds' contract as Rangen specifically made the feed to fulfill the Stembridges' order. National communicated the Stembridges' order of crumlets to Rangen. Rangen fulfilled the order and shipped the feed to the Stembridges. As a result, Rangen should have reasonably expected the Stembridges to use the feed and the express warranty extends to the Stembridges as third party beneficiaries.

Both Idaho and Utah law requires that a "commercial feed . . . offered for sale or sold or otherwise distributed in this state . . . shall have . . . a label bearing" statutorily required information. Idaho Code Ann. § 25-2705(1) (2012); Utah Code Ann. § 4-12-5; Utah Admin. Code R68-2-4 (2013). These provisions require the label to set forth the minimum percentage of crude fat and quantity of vitamin E. The label must also list the common or usual name of each ingredient used in the manufacture of the feed. If the "composition or quality falls below or differs from that which it is purported or is represented to possess by its labeling," a commercial feed is considered adulterated. Idaho Code Ann. § 25-2707(8); Utah Code Ann. § 4-12-2(1)(b).

In this case, the Stembridges have put forth sufficient evidence that the Lactation and

Reproduction Crumlets did not conform to their label description as expressly warranted by Rangen and as required by state law to survive summary judgment. There is evidence that the Reproduction Crumlets were lower than the label stated for Vitamin E and crude fat, and that the Lactation Crumlets contained monensin, which is recognized as a drug by the FDA, 21 C.F.R. § 558.4, and the label did not list it as an ingredient.

### B. Implied Warranties of Merchantability & Fitness for Particular Purpose

Under both Utah and Idaho law, implied warranties of merchantability and fitness for a particular purpose exist pursuant to statute. Idaho Code § 28-2-314 to -315; Utah Code Ann. § 70A-2-314 to -315. Rangen argues that it did not sell the Stembridges any feed and no statutory implied warranty arose between Rangen and the Stembridges.

However, Rangen's implied warranty of merchantability to National Feeds extends to the Stembridges as a matter of law and as third-party beneficiaries. *See* Utah Code Ann. § 70A-2-104(1); § 70A-2-318. "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. *Id.* § 70A-2-318. The implied warranty of merchantability is "implied in a contract for [the sale of goods] if the seller is a merchant with respect to goods of that kind." Utah Code Ann. § 70A-2-314(1). As discussed above with respect to an express warranty, it would be unjust to recognize a rule that would permit manufacturers of goods to represent that goods possess qualities they do not possess, and then deny the customer to recover damages because there is no privity of contract existing between the consumer and the manufacturer.

To be merchantable, goods must, at a minimum, satisfy certain criteria, including that they "pass without objection in the trade under the contract description; be "of fair average quality within the description"; be "fit for the ordinary purposes for which such goods are used";

"run, within the variations permitted by the agreement, of even kind, quality, or quantity within each unit and among all units involved"; be "adequately contained, packaged and labeled as the agreement may require"; and "conform to the promises or affirmations of fact made on the container or label." Utah Code Ann. § 70A-2-314(2)(a)-(f). The Stembridges have submitted evidence that Rangen's crumlets breached these implied warranties of merchantability because the Reproduction Crumlets did not contain the fat and vitamin E described on the label and the Lactation Crumlets were adulterated by the addition of monensin with no listing of such on the label. This evidence is sufficient to survive summary judgment on the implied warranty claim.

## II. Strict Product Liability, Negligence, and Negligent Misrepresentation Claims

### A. Causation

Regardless of the theory, Rangen contends that the Stembridges cannot show that the feed caused their losses because the Stembridges' expert, Dr. Hildebrandt, provides opinions that lack both factual and scientific bases. Dr. Hildebrandt's expert reports detail his theory for determining that the Reproduction Crumlets and Lactation Crumlets caused the Stembridges' losses. Contrary to Rangen's position, the court does not believe this is a case where the expert testimony can be found to be wholly inadmissible. As discussed above, Rangen's criticisms relate to the weight to be accorded to, and not the admissibility of, Dr. Hildebrandt's opinions.

The disputed question of causation is a question of fact that cannot be resolved by the court based on the record before it. Summary judgment on a negligence claim can only be granted in the clearest of circumstances. "It is only when the facts are undisputed and but one reasonable conclusion can be drawn therefrom" that proximate cause can become a question of law. *Apache Tank lines v. Cheney*, 706 P.2d 614, 615 (Utah 1985). "[W]hen there is doubt about the matter, it should be resolved in favor of permitting the party to go to trial." *Rees v.*

*Albertson's, Inc.*, 587 P.2d 130, 133 (Utah 1978).

Rangen seeks to impose a higher burden of proof than is required by Utah law. The Stembridges need not prove causation with the level of precision advocated by Rangen and can instead prove causation circumstantially. In *Alder v. Bayer Corp.,* the court held that causation was an issue for the jury when there were "allegations of daily exposure during the period in which symptoms developed to substances documented as causative agents for the specific harm alleged." 2002 UT 115, ¶ 75. Where the plaintiffs show that the symptoms experienced are documented in connection with exposure to the chemical at issue, "[a]ny argument that their illnesses stem from other causes creates an issue of triable fact." *Id.* at ¶ 84.

Causation has been found to be a jury questions in less compelling circumstances. Rangen has not proffered an alternative explanation of the Stembridges' losses. Rather, it criticizes the Stembridges' theory of causation pointing to conflicting test results and an absence in Dr. Hildebrandt's reports of analysis regarding vitamin E depletion rates and minks' Vitamin E requirements. Rangen's critique, however, goes to the weight of the Stembridges' evidence and does not show either an absence of a genuine dispute of material fact or that Rangen is entitled to judgment as a matter of law. The court cannot place an emphasis on tests that are favorable to Rangen when the standard for summary judgment requires the court to view the evidence in a light favorable to the nonmoving party. In fact, the court cannot weigh disputed facts and evidence on summary judgment.

Moreover, regardless of Dr. Hildebrandt's opinions, the Stembridges have otherwise provided sufficient and adequate evidence of causation to create genuine disputes of material fact as to the cause of the Stembridges' losses. The Stembridges have submitted evidence that the only farmers that experienced losses comparable to the Stembridges also fed National Feeds'

crumlet to their mink. Medical and laboratory evidence exists that allow the jury to conclude that the losses were caused by the crumlets. Rangen's expert admitted that monensin is toxic to mink and other evidence from his deposition is available regarding the causes and symptoms of Vitamin E deficiency and ionophore toxicity. This evidence, combined with the timing of the losses and the Stembridges' physical observations, is sufficient to allow a jury to determine causation even without Dr. Hildebrandt's opinion. Accordingly, Rangen is not entitled to summary judgment as to causation.

## B. Negligence Per Se

Furthermore, Rangen's alleged violation of federal and state feed laws can be determined to be prima facie evidence of negligence and provides evidence sufficient to withstand Rangen's motion for summary judgment on the Stembridges' negligence claim. "As a general rule, violation of a standard of safety set by statute or ordinance is prima facie evidence of negligence." *Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981). "Prima facie evidence is 'that quantum of evidence that suffices for proof of a particular fact until the fact is contradicted by other evidence." *Child v. Gonda*, 972 P.2d 425, 432 (Utah 1998).

Rangen's alleged violation of commercial feed law could be considered negligence per se. "Negligence per se, which usually results from the violation of a statute, is defined as 'conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances." *Child*, 972 P.2d at 432. A statutory provision may be adopted as the standard of conduct for a reasonable person if the statute's purpose, in whole or in part, is : "(a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect the particular interest against the kind of harm which has resulted, and (d) to protect

that interest against the particular hazard from which the harm results." *Rollins v. Peterson*, 813 P.2d 1156, 1163 (Utah 1991). Before a statute can be used to impose a tort duty, the statute's purpose must be to protect a class of persons of which the plaintiffs are members and to protect against the type of harm experienced. *See id.* at 1163-64.

The commercial feed statutes are intended to protect against the particular kind of harm and the particular hazard that the Stembridges allege caused their minks deaths. *See White v. Rose*, 241 F.2d 94 (10th Cir. 1957) (reviewing Colorado commercial feed law and concluding that plaintiff's loss of cattle after feeding adulterated feed was "the very kind [of injury] that the statute was intended to prevent."). The Stembridges, as the ultimate recipients of the crumlets, are within the class of persons whose interest is to be protected by the statutes. The statutes expressly proscribe the distribution of adulterated feed. The failure of the feed to meet the label guarantees and to identify all of the ingredients and drugs exacerbated the minks propensity to become vitamin E deficient and immunosuppressed by having inadequate vitamin E available to protect against the monensin. Under these circumstances, there is a question of fact as to whether Rangen's alleged failure to comply with the commercial feed statutes was negligence per se.

### C. Negligent Misrepresentation

Rangen claims that the Stembridges have no cause of action for negligent misrepresentation under Utah law. Under Utah law, the party from whom recovery is sought must actually misrepresent a material fact. *Jardine v. Brunswick*, 423 P.2d 659, 663 (1967). In this case, however, Rangen contends that it made no representations to the Stembridges because none of the Stembridges ever spoke to anyone at Rangen. To the extent that the Stembridges claim that Rangen made representations on the shipping documents, Rangen argues that the

shipping documents do not provide a warranty because Rangen did not sell the feed. Moreover, Rangen argues that it applied National Feeds' label so the label cannot be considered a representation by Rangen.

The Stembridges have submitted evidence that the Reproduction Crumlets and Lactation Crumlets did not conform to their label description as required by state and federal law. This failure can constitute a negligent misrepresentation. Utah law provides that "a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury" if "the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact." *Price-Orem Inc. Co. v. Rollins, Brown and Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986). "Privity of contract is not a necessary prerequisite to liability." *Id.*

In this case, Rangen knew that the Lactation and Reproduction Crumlets were being manufactured for the Stembridges and could have reasonably foreseen that the Stembridges would rely on Rangen's representation that the crumlets would conform to their label descriptions. Whether Rangen authored the labels with which it failed to comply is irrelevant to the analysis. Rangen stated that its feed would comply with the label and it agreed to such with National Feeds. Rangen did not need to make the label to have the duty. It made the feed and put the label on the feed. Therefore, state and federal law required it to comply with the obligations to make sure the feed was properly labeled.

In addition, Rangen asserts that, to the extent that the Stembridges claim that the label on the feed presented a representation, the Stembridges cannot show how the feed caused harm to the mink. As discussed above, there is a question of fact as to the causation issue. Moreover, the

Stembridges assert that if the labels had been correct, they would have acted differently. Accordingly, the court concludes that there is no basis for granting Rangen summary judgment on the Stembridges' negligent misrepresentation claim.

### D. Strict Product Liability Claims

In addition to causation, a plaintiff seeking to recover under a theory of strict product liability must also show that the product was unreasonably dangerous at the time it left Rangen's facilities. *Niemela v. Imperial Manufacturing, Inc.*, 263 P.3d 1191, 1195 (Utah Ct. App. 2011). Rangen contends that the Stembridges do not have sufficient evidence to meet this standard. However, the Stembridges claim that the feed was defective because of rancidity, low fact, and borderline vitamin E in the Reproduction Crumlets and monensin in the Lactation Crumlets. The Stembridges argue that the Reproduction Crumlet and Lactation Crumlet were unreasonably dangerous because of their design, manufacturing, and Rangen's failure to provide adequate warnings regarding the use of the crumlets. *Niemela*, 2011 UT App. 333, ¶ 8.

"'[U]nreasonably dangerous' means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer." Utah Code Ann. § 78B-6-702. The Stembridges argue that the manufacturing defects in the crumlets caused them to be unreasonably dangerous because an ordinary and prudent mink rancher would not expect supplemental crumlet, which is marketed as a complete feed, to cause vitamin E deficiency, immunosuppression, death, and diminished production. An ordinary mink rancher would not assume that the Reproduction Crumlet had insufficient levels of vitamin E and fat or that the Lactation Crumlet contained monensin, which

is not approved for use in mink, potentially toxic, and can cause the mink to deplete their available vitamin E.  In response, Rangen takes issue with the test results relied upon by the Stembridges and the theory that the monensin levels of the Lactation Crumlets were high enough to cause toxicity.  These disputes, however, raise questions of fact to be determined at trial by a jury.  They do not provide a basis for summary judgment.

The Stembridges also assert that the crumlets were also unreasonably dangerous because Rangen failed to provide adequate warnings.  "Where a manufacturer knows or should know of a risk associated with its product, the absence or inadequacy of warnings renders that product 'unreasonably dangerous,' subjecting the manufacturer to strict liability."  *House v. Armour of Am., Inc.*, 929 P.2d 340, 343 (Utah 1996).  The Stembridges contend that Rangen should have undertaken quality control testing and that with such testing Rangen should have known that the crumlets did not meet the label guarantees and were adulterated with monensin.  The only language on the Reproduction Crumlet that could be construed as a warning was a statement suggesting that the mink could lose too much weight.  The Lactation Crumlet failed to contain a warning that the product contained monensin and failed to identify it as an ingredient.

Under Utah law, the Stembridges are entitled to a presumption that they would have heeded an adequate warning.  The Stembridges assert that had they been adequately warned, they would not have fed their mink the crumlets or they would have taken other precautions.  Therefore, the court concludes that Rangen is not entitled to summary judgment on the Stembridges' strict product liability claim.

## CONCLUSION

Based on the above reasoning, Defendant Rangen's Motion to Exclude Expert Testimony is DENIED and Defendant Rangen's Motion for Summary Judgment is DENIED.

Dated this 23rd day of September, 2013.

BY THE COURT:

_____
Dale A. Kimball,
United States District Judge